## BLANDING, et al. v DEPARTMENT OF CORRECTIONS
### Case No. 86-1918R
State of Florida, Division of Administrative Hearings
September 9, 1986

### APPEARANCES OF COUNSEL
**William Joel Keel,** authorized representative, for petitioners.
**Julia P. Forrester,** Assistant Attorney General, for respondent.

### OPINION
ARNOLD H. POLLOCK, Hearing Officer.

### *FINAL ORDER*
Consistent with the Order Granting Continuance signed by the undersigned and furnished to the Respondents on July 1, 1986, a hearing was held in this case before Arnold H. Pollock, a Hearing Officer with the Division of Administrative Hearings at the Union Correctional Institution on July 28,1986. The issue for consideration

was whether Respondent's proposed Rule 33-3.083, *Florida Administrative Code*, constitutes an invalid exercise of delegated legislative authority.

## BACKGROUND INFORMATION

On May 25, 1986, the three current Petitioners along with Mark Dingle, another Petitioner who prior to the hearing withdrew from the case, filed a Petition to Determine the Invalidity of An Existing Rule, with reference to Department of Corrections Rule 33-3.083, asserting that the rule in question is invalid on several grounds, including that it is unreasonable, arbitrary and capricious. The Petition was forwarded to the Director of the Division of Administrative Hearings for the appointment of a Hearing Officer. Hearing was originally scheduled for June 27, 1986, by Notice of the undersigned dated May 30,1986. However, based on Petitioner's Motion for a Continuance, the case was postponed until July 10,1986, and thereafter again on Petitioner's Motion for Continuance *ore tenus*, to July 23, 1986.

At the hearing, Petitioner presented the testimony of Ronald Burris Jones, Deputy Assistant Secretary for Operations of the Department of Corrections; Thomas L. Barton, Sr., Superintendent of Union Correctional Institution; T. J. Cunningham, Chief Classification Officer at UCI; Alfred Moore; Robert Edwin Reichman; Virgil Lee Page; Stanley Blanding; and William F. Roberts, all inmates at Union Correctional Institution, and Marvin L. Tyson, Corrections and Probation Officer I at UCI. Petitioner also introduced Petitioner's exhibits 1, 2, and 4. Petitioner's Exhibit 3 was offered but not admitted. Respondent presented the testimony of Milton R. Hicks, Assistant Superintendent for Operations at UCI; and Mr. Jones, who testified previously for the Petitioner. The Hearing Officer took Official Recognition of Exhibits 1, 2, and 3.

Subsequent to the hearing, both parties submitted proposed Final Orders which contained proposed Findings of Fact. These proposed Findings of Fact were thoroughly evaluated and considered in the preparation of this final order. A ruling as to each proposed Finding of Fact is contained in the Appendix to this final order.

## FINDINGS OF FACT

1. The Petitioners Blanding, Roberts and Page are all inmates of Union Correctional Institution. At the time of filing the Petition and at the time of hearing, Petitioners Blanding and Roberts were designated as close management inmates pursuant to the Respondent's Rule 33-3.083, *Florida Administrative Code*. Petitioner Page was not in close

management at the time the Petition was filed or at the time of the formal hearing. The last date of his close management status was April 14, 1986.

2. Inmates are placed in close management when in the opinion of corrections officials, they constitute a threat to their own safety or the safety of others, or to the ability of the officials to control the inmate population, and the authorities are satisfied there is a need that they be confined for longer periods than authorized by the imposition of administrative management. The threat to themselves as mentioned above does not include the filing of grievances or any other legitimate inmate activity designed to protect the inmate's interest.

2. Close management consists of two levels of supervision: Close Management I and Close Management II. Prior to being placed in close management, an inmate is evaluated to determine if he meets the criteria for close management status and if so, generally in inmate is placed in Close Management I initially. Close Management II is a less restrictive form of close management and is imposed on those inmates who have demonstrated a "positive adjustment" to close management status. Inmates may be placed initially in Close Management II if, in the opinion of the evaluators, it is likely they would adjust favorably to that status and the more severe close management status is not necessary.

3. In determining whether an inmate should be placed in close management, the close management board of five members evaluates the inmate's record to see if he "has demonstrated a non-receptiveness to the correctional process in an open population by such characteristics as: subparagraph (1) recent demonstrations of violence; (2) a continuing pattern of disciplinary behavior; (3) involvement in acts which seriously interfere with staff effort; (5) involvement in acts which cause injury or death to others; (5) being an extreme escape risk." The above criteria are cited in Rule 33-3.083(2)(a), *Florida Administrative Code.*

4. Prior to the hearing, the inmate being considered for close management is provided notice that his institutional status will be reviewed by the Board in a hearing to which the inmate is a party. The inmate is given notice of the alleged conduct which forms the basis for consideration of close management. In addition to the specific misconduct alleged, the Board also considers inmate records, investigative and other reports, and statements from confidential informants, if any. Some of these documents are not furnished to the inmate. Once the Board has arrived at a conclusion, the inmate is notified of it, but is

268

not necessarily given a thorough explanation of all reasons for imposition of close management relied on by the Board.

5. Of all close management hearings conducted at UCI since the inception of this procedure, no witnesses have appeared before the Board on behalf of inmates other than the inmate himself. Though the rule requires inmates be advised of their right to call witnesses, there is some indication that all inmates have not been clearly advised of this right. There is no indication that any inmate appearing before a close management board has ever requested that a witness be present. In the event that this is done, the rule provides for postponement of the hearing to make such witness present.

6. Once an individual is placed in close management, a review of his case, including a personal visit by a corrections officer, is held initially once a week for thirty days and thereafter, every 30 days. There is some indication that these follow-up visits and evaluations may not go into great detail. However, it is clear that corrections officials who are charged with the responsibility for monitoring the inmates are aware of the inmate's progress and have sufficient information upon which to base a valid judgment. After a review session is completed, the decision is made whether to upgrade the status of the inmate, to retain him in close management, or to release him. The reasons for continuing an inmate in close management are not necessarily provided to the inmate nor is the inmate privy to the reasoning process of the evaluation committee.

7. Petitioners contend that no method is employed to determine the reliability of inmate confidential informants by either the Board members of the institution superintendent. The investigative reports considered by supervisory personnel do not necessarily contain the evaluator's opinion of the informant's reliability. In some cases, the superintendent will personally evaluate the informant. In other cases, he may not. In many instances, hearsay evidence is considered by the Superintendent or the Committee evaluating the need for close management. This is not necessarily improper. Ideally, careful verification of all allegations which may result in the deprivation of a prisoner's limited liberty would be beneficial and desired. However, it cannot be forgotten that this entire operation is a part of a custodial prison situation and it is clear that at lease the basic due process required is in fact guaranteed.

8. When an inmate is placed in close management, his status is similar to that in disciplinary confinement or administrative confinement in that certain activities and privileges available to open population inmates are curtailed. Prison officials contend that close manage-

269

ment is never used for disciplinary purposes and every effort is made to afford inmates in close management all rights and privileges granted to those inmates in the general population. It is difficult to conceive how the inmate, however, evaluated for his non-receptiveness to the correctional process as demonstrated by such activities as violence, aberrant behavior, interference with staff effort, and involvement in acts which cause injury or death could consider his subsequent placement in close management as anything other than disciplinary activity. However, the appearance of the status is not the controlling factor. Prison officials must have some measure of control and method to prevent aberrant behavior and dangerous activity. If the prisoners perceive this as punishment, it is, nonetheless, appropriate and legal.

9. Inmates who are in close management receive basic gain time and are eligible to receive additional gain time to the extent that special programs and work which would support additional gain time are available. At the present time, UCI does not have adequate funding to provide those additional programs, and as a result, additional gain time through educational programs and the like are not available to close management prisoners at that institution though they have been in the past. To the extent that prisoners in close managements can work, additional gain time can be earned while in close management. From a practical standpoint, only three of 83 current inmates in close management have an opportunity for a job assignment to justify or allow the earning of additional gain time. This is not a significant number.

10. Those prisoners who are placed in close management are, by rule, to be provided certain comfort items and the rule also provides minimum housing requirements as well as conditions under which inmates in close management may participate and work in educational activities. As was stated above, the rule provides for work and educational activities for the prisoners through which they may earn additional gain time, but, at Union Correctional Institution, they are unavailable due to funding constraints. Close management inmates are allowed correspondence privileges to the same extent as general inmate population prisoners and are also given access to the law library to the maximum extent possible considering security considerations.

11. Not all institutions within the Department of Corrections are authorized to conduct a close management program. Only the Florida State Prison, Union Correctional Institution, Broward Correctional Institution, Martin Correctional Institution, and the Reception and Medical Center may do so. The selection of these institutions was based on physical considerations as well as the character of the inmates assigned to each. As a general rule, inmates in the selected institutions

270

have committed more serious offenses or have exhibited that degree of disruptive behavior or non-receptiveness to the correctional process at other institutions that they have been transferred to UCI or other institutions as named with higher security and standards and resources.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the parties and the subject matter of these proceedings.

Petitioners have indicated eight specific bases for their belief that various portions of Rule 33-3.083 are unreasonable, arbitrary and capricious. For example, they allege that subparagraph (2)(a)1 fails to define "non-receptiveness" or "recent demonstrations of violence" with sufficient definitiveness to support close management as an exceptional action. This allegation is not supported by any reasonable logic. Prison officials, placed in a position of responsibility for a multi-thousand inmate institution, must have available to them, tools with which to not only correct situations of stress and danger, but also prevent them. Preventive action is by far preferable to corrective action. The rule in question is amply clear in its definition of grounds for placing inmates in close management and the section complained of here specifically states that non-receptiveness is exemplified by such characteristics as recent demonstrations of violence. The words complained of are not so unique or unusual as to require an exceptional definition. Violence is by its nature and by its own definition clearly capable of explanation. Consequently, this attack is without merit.

Petitioners also contend that subparagraph (2)(a)2 of the rule is unreasonable, arbitrary and capricious in that it, too, is imprecise in failing to define "a continuing pattern of serious disciplinary behavior" alleging that the term "serious" is left to conjecture and the unchanneled discretion of any accuser. Again, "serious" is not so unique a word that it requires unusual definition. The parties charged with the implementation of the rule must, in a situation such as here, have the authority to define within reason the criteria under which they will implement this tool available to them. There is, of course, a procedure available to the inmate for the redress of an improper application of the rule. That is the grievance procedure which has been evaluated and sustained on many occasions which the appropriate method to contest inappropriate action by prison authorities. Clearly here, the terms of the rule are not so confusing as to be fatally flawed.

This same section is also considered by Petitioners to be an unreasonable, arbitrary and capricious abuse of discretion because it theoretically allows Respondent to annex additional punishment to that previ-

**271**

ously imposed in a disciplinary proceeding by allowing the Respondent to confine a prisoner even though no new disciplinary infraction has occurred. That is, of course, the basis for the rule in the first place. If agents of the Respondent face aberrant behavior and a problem situation on the part of an inmate which, if allowed to progress, is likely to result not only in a crisis situation within the institution but also possibly an additional term of confinement for the inmate involved, it seems most appropriate that they have the opportunity, by an excision of this individual from the general population, to prevent the disruptive behavior and save, *inter alia*, the inmate himself, from this additional confinement. In any event, there is no showing that the rule has been improperly applied and such a showing would appear to be at least a minimum requirement to establish that it is subject to repeated abuses of discretion. Consequently, this particular attack is also without merit.

Petitioners allege that subparagraph (2)(a)3 is unreasonable, arbitrary and capricious in that the terms "interfere" and "staff effort" are imprecise and provide no warning to inmates as to what conduct will result in imposition of the penalty. This reasoning is clearly specious. Little room is left to inmates to exercise discretion as to the meaning of directions given them and to contend that the rule here is imprecise and indefinite is clearly unjustified. There is little chance that, as urged in the Petition, the impreciseness of the rule may subject inmates to arbitrary and capricious impositions of penalties. Clearly the program is designed to prevent serious confrontation. No doubt some latitude must be left to prison officials in the implementation of this program. But this latitude is not so great as to render the rule itself fatally imprecise.

Petitioners next allege that subparagraph (2)(a)5 of the rule is arbitrary and capricious in that the use of the term "extreme" in defining an escape risk is insufficiently defined. Petitioners contend that the rule fails to require any evidence for placement on this basis that the inmate is subjected to the rule and its consequences on mere suspicion and hearsay. Prisoners allege that the rule fails to insert the essential requirement for criminal intent and that it is fatally defective. This is just not so. An escape by its very term when applied in a prison situation implies in the loudest of terms the required illegality of the action. Departure from a prison situation under legal terms is defined as release. "Escape" by its very definition, includes illegality and it is ingenuous at least to contend that the use of the term "extreme" in relationship to an escape risk is confusing or permits improper or unjustified punishment. "Extreme" here means that if not controlled, the inmate is likely to escape.

272

Subparagraphs 4(a), (b) and (c) are alleged to be not only unreasonable, arbitrary and capricious, but also an abuse of discretion in that they allow the close management team to conduct a hearing without allowing the inmate the opportunity to submit evidence in his behalf. A careful reading of the terms of the rule themselves establish that these allegations are clearly without merit. The rule contains such guarantees as "documentation requirements" and an authorization for the inmate to present "any facts or arguments relevant". The management team may delay the hearing to allow the inmate additional time to prepare and if requested, a staff member may be assigned to assist the inmate. Taken together, these provisions, along with the requirements that the inmate be informed and that the action of the team be reviewed, clearly establish a thorough conformity with the requirements of due process. If there is an abuse committed at Union Correctional Institution; if the rule is not followed, the appropriate corrective measure is a grievance action rather than an attack on the rule itself. Clearly the rule is appropriate and not fatally flawed in this particular.

Petitioners next attack subparagraph 6(a) and (b) by alleging that the decision of the team is subject to no review and that other review processes are ineffective and insignificant. Reading of the rule provisions fails to support but instead loudly contradicts this allegation. In fact, the rule provides that if an inmate is confined for more than 30 days, the superintendent *shall* review the decisions of the team at least every 30 days, and there is a requirement that memoranda supporting or memorializing the dates and actions of the review team be placed in the inmate's record for review by the superintendent or any other authorized individual. Quite to the contrary of the allegation by Petitioners, this rule clearly provides for appropriate safeguards.

Finally, Petitioners allege that the rule in its entirety is unreasonable, arbitrary and capricious and an abuse of discretion in that it provides unspecified penalties not authorized by the Legislature and its contains no definite limit on the length of time an inmate may be maintained in the program. As to the latter, clearly the rule provides for continuing review and timely evaluations of the individual in the program. In addition, if the inmate is maintained in the program for more than 90 days, he must be psychologically evaluated every 90 days. The goal of the program as set out in subparagraph (6)(e) of the rule is to return the inmate to the open population as soon as it can be safely done. That an ultimate date is not specified does not constitute a defect in that the entire period of the inmate's scheduled incarceration can be reasonably utilized in close management. If the inmate continues to demonstrate those traits which justify imposition of close management,

**273**

there is absolutely no flaw in or failure of the system in requiring him to undergo the constraints of that program so long as they are justified. Consequently, this allegation is without merit.

It is clear that the Petitioners have failed to establish that the rule represents any unauthorized exercise of delegated legislative authority. It sets reasonable guidelines for the determination of whether or not an inmate should be excised from the general population and given more specialized attention. As was stated previously, it is imperative that prison officials have the authority to classify and excise from the general population in a proper manner those prisoners who have demonstrated aberrant behavior or who constitute a clear threat to the system and other individuals from the general population. An adequate review process is inherent in the system and in effect and ensures that the program is not abused but utilized only when necessary.

Based on the foregoing Findings of Fact and Conclusions of Law, it is therefore

ORDERED that:

The Petition of Stanley Blanding, William Roberts, Virgil Page, to Determine the Invalidity of Rule 33-3.083, *Florida Administrative Code*, be dismissed.

DONE and ORDERED this 9th day of September, 1986, in Tallahassee, Florida.